# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

DARLENE SUAZO-ABEYTA,            )
                                 )
      Plaintiff(s),            )
                                 )
vs.                              )
                                 )    Case No. CIV 02-66 WFD/WDS
QWEST CORPORATION, a Delaware    )
Corporation, formerly U.S. WEST  )
COMMUNICATIONS, INC.,            )
                                 )
      Defendant(s).            )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter comes before the Court on cross motions for summary judgment filed by plaintiff and defendant. The Court having considered the motions, briefs, and the record submitted by the parties, and being otherwise fully advised, FINDS and ORDERS as follows:

### JURISDICTION

The short-term disability plan and pension plan at issue in his case are governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq., and jurisdiction is present pursuant to 29 U.S.C. § 1132(e)(2).

### STANDARD OF REVIEW

Despite the fact that the motions before the Court are styled as motions for summary judgment, the instant case is essentially an appeal pursuant to 29 U.S.C. § 1132 of Qwest

Corporation's ("Qwest")[1] decision to deny benefits to the Plaintiff.  To determine which party is entitled to judgment in this ERISA appeal, the Court must consider the degree of deference due the decisions of the plan administrators.  ERISA itself does not set forth the standard of review to be employed by courts in reviewing a plan administrator's denial of benefits.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989).  In *Firestone Tire & Rubber Co. v. Bruch*, however, the United States Supreme Court, relying on principles of trust law, determined that courts should apply a *de novo* standard of review regarding a plan administrator's denial of benefits, unless the benefit plan gives the plan administrator discretionary authority to determine an employee's eligibility for benefits or to construe the terms of the plan.  *Id*. at 115.  If discretion is given to the plan administrator to determine eligibility or construe terms, the court should review the decision to deny benefits for abuse of discretion.  *Id.*  The Tenth Circuit has consistently held that the abuse of discretion standard of review is synonymous with arbitrary and capricious review in the ERISA context.  *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 n.1 (10th Cir. 1996); *Fought v. Unum Life Insurance Co. of America*, 379 F.3d 997, 1003 n.2 (10th Cir. 2004).

In this case, the plans in issue give the administrator discretion.  The U.S. West Disability Plan ("Disability Plan") gives the Plan Administrator "the right and discretion to determine for

---

[1] It should be noted that Qwest Corporation was U.S. West Communications, Inc. ("U.S. West") during the time the Plaintiff worked for the company.  Any time the Court refers to "U.S. West" in this Order the Defendant Qwest is incorporated by reference.

all parties, all matters of fact or interpretation relating to the administration of Plan provisions, including questions of eligibility and any other matters."  Disability Plan, Art. II ¶ 2.2. Likewise, the Qwest Pension Plan Document ("Pension Plan") provides that the Plan Administrator shall have "full discretion and power to interpret the Plan, to determine the eligibility status and rights of all persons under the Plan and in general to decide any dispute." Pension Plan, Art. VIII,

¶ 8.8(a).  Therefore, the Court must review the decisions of the Plan Administrators in this case under an arbitrary and capricious standard of review.  *Fought*, 379 F.3d at 1003.  Such a review is limited to the administrative record.  *Id.*  A lack of substantial evidence, mistake of law, bad faith, or conflict of interest are all indicia of arbitrary and capricious action in the Tenth Circuit. *Caldwell v. Life Ins. Co. of North America*, 287 F.3d 1276, 1282 (10th Cir. 2002).

<u>Conflict of Interest</u>

As the parties point out, the arbitrary and capricious standard of review can be modified when the plan administrator is operating under a conflict of interest.  *See Fought*, 379 F.3d at 1003.  "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'"  *Id.* (quoting *Firestone*, 489 U.S. at 115).  The Tenth Circuit in *Chambers v. Family Health Plan Corporation*, adopted a sliding scale approach to the standard of review when a conflict of interest is present.  *Chambers*, 100 F.3d at 826.  Though the court must always apply an arbitrary and capricious standard of review when the plan administrator

-3-

has been given discretion by the plan, "the court must decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict." *Id.* at 825.  In *Fought v. Unum Life Insurance Company of America*, the Tenth Circuit took the opportunity to clarify the sliding scale approach and adopted a burden shifting approach for "serious" or "inherent" conflicts of interest.

In *Fought*, the Tenth Circuit distinguished between two types of conflicts of interest – standard and inherent – and established two different rules depending on the type of conflict involved in the case.  *Fought*, 379 F.3d at 1005-06.  First, the court discussed standard conflict of interest cases, or cases in which the administrator "may wear two hats" – one as fiduciary and one as settlor.  *Id.* at 1005.  The court held "that in every case in which the plan administrator operates under a conflict of interest – or a 'standard' conflict of interest case – the plaintiff is required to prove the existence of the conflict."  *Id.* (citation omitted).

> Evidence of a conflict of interest requires proof that the plan administrator's dual role jeopardized his impartiality.  The mere fact that the plan administrator was a [company] employee is not enough per se to demonstrate a conflict.  Rather, a court should consider various factors including whether:  (1) the plan is self-funded; (2) the company funding the plan appointed and compensated the plan administrator; (3) the plan administrator's performance reviews or level of compensation were linked to the denial of benefits; and (4) the provision of benefits had a significant economic impact on the company administering the plan.  If the plaintiff cannot establish a serious conflict of interest, we consider defendant's standard conflict of interest as one factor in determining whether defendant's denial of disability benefits to plaintiff was arbitrary and capricious.

*Id.* (citations and quotations omitted).

If the plaintiff is able to prove the existence of a "serious" conflict or if the plan

administrator has an inherent conflict, a burden shifting approach should be taken.  *Id.* at 1006.

> When the plan administrator operates under either (1) an inherent conflict of interest,
> [such as being both insurer and administrator of the plan]; (2) a proven conflict of
> interest; or (3) when a serious procedural irregularity exists, and the plan
> administrator has denied coverage, an additional reduction in deference is
> appropriate.  Under this less deferential standard, the plan administrator bears the
> burden of proving the reasonableness of its decision pursuant to this court's
> traditional arbitrary and capricious standard.  In such instances, the plan
> administrator must demonstrate that its interpretation of the terms of the plan is
> reasonable and that its application of those terms to the claimant is supported by
> substantial evidence.  The district court must take a hard look at the evidence and
> arguments presented to the plan administrator to ensure that the decision was a
> reasoned application of the terms of the plan to the particular case, untainted by the
> conflict of interest.

*Id.* at 1006 (citations omitted).

Though the motions in this case were briefed before the Tenth Circuit's decision in *Fought* was filed, the parties do address the conflict of interest issue.  Plaintiff's motion for summary judgment asserts that Qwest's Plan Administrator operates pursuant to an inherent conflict of interest acting as both Plan Administrator and insurer or funding source for the disability plan.  Plaintiff also attempts to draw a distinction between an abuse of discretion standard and arbitrary and capricious review, relying on authority outside the Tenth Circuit and arguing that abuse of discretion applies to ERISA cases, and not arbitrary and capricious review.  *Id.* at 8-10.  As the Court has already made clear, the Tenth Circuit has held that the two standards are interchangeable in the ERISA context.  *Fought*, 379 F3d at 1003 n.2.

Defendant acknowledges that conflicts of interest must be considered as a factor under arbitrary and capricious review, but submits that mere allegations that the Plan Administrator has

a conflict of interest are not sufficient to reduce the degree of deference given to the Plan

Administrator's decision.  Defendant points out that the only evidence Plaintiff has offered to

support a conflict of interest is that Qwest both administers and funds its plan.  Defendant asserts

that its income is almost entirely from sources other than the administration of its employee

benefits plan and concludes that the maximum degree of deference under arbitrary and

capricious review should be applied.

First, the Court considers whether the Plan Administrator under Qwest's Disability Plan

operates under a conflict of interest when making benefit decisions.  The Court must consider

four factors in determining whether a "serious" conflict of interest exists: (1) whether the plan is

self-funded; (2) whether the company funding the plan appointed and compensated the plan

administrator; (3) whether the plan administrator's performance reviews or level of

compensation were linked to the denial of benefits; and (4) whether the provision of benefits had

a significant economic impact on the company administering the plan.  *Fought*, 379 F.3d at

1005.

Under the Disability Plan, the Plan Administrator is the U.S. West Employee Benefits

Committee ("EBC"), which is composed of U.S. West employees.  Disability Plan, Art. I ¶ 1.31.

The Disability Plan's sponsor is the "Company," which is defined as "U.S. West, Inc., a

Delaware corporation."  *Id.* Art. II ¶ 2.1(a); Art. I ¶ 1.9.  "The entire cost of providing benefits

[under the Disability Plan]" is borne by the Company.  *Id.* Art. II ¶ 2.5.  The Plan allows U.S.

West to provide for the payment of benefits in one of two ways.  First, the benefits can be paid

directly from the general assets of U.S. West. *Id.* Art. II ¶ 2.6. In the alternative, a trust can be funded by U.S. West from which benefits can be paid. *Id.* Art. II ¶ 2.5. U.S. West's contribution to the trust fund can be in the form of U.S. West's common stock and up to 25% of the trust can be invested in U.S. West stock. *Id.* It is unclear in this case whether such a trust was ever established or whether U.S. West would have had to pay for the Plaintiff's disability benefits out of the general assets of the company.

In considering the factors, the Court finds first, that there is no conclusive evidence that the Disability Plan was self-funded. Indeed, the Disability Plan's sponsor is the "Company," and the entire cost of administering the plan is borne by the Company. *Id.* Art. II ¶¶ 2.1(a), 2.5. Though a trust can be established to pay out benefits, there is no indication that such a trust was created in this case. *Id.* Art. II ¶ 2.5. Second, under the Disability Plan, the Plan Administrator is the U.S. West Employee Benefits Committee ("EBC"), which is composed of U.S. West employees. *Id.* Art. I ¶ 1.31. Thus, Qwest compensates the Plan Administrator. Third, despite the fact that the EBC is comprised of Qwest employees, there is nothing to prove that the Plan Administrator's compensation or reviews were tied to denial of benefits. Finally, Defendant denies that payment of benefits would economically impact the company. Defendant points out that it derives its income almost entirely from sources other than the administration of its employee benefits plan.

As noted above, the Plaintiff has the burden of proving a conflict of interest. *Fought*, 379 F.3d at 1005. The Court is convinced by the reasoning of the Defendant that Plaintiff has not

proven that the Plan Administrator for the Disability Plan was operating under a "serious" conflict of interest.  This case is similar to the situation in *Kimber v. Thiokol Corporation*, where the plan administrator was an employee, but he had no pecuniary interest in whether benefits were granted or denied and granting benefits would have had no significant impact on the company.  196 F.3d 1092, 1098 (10th Cir. 1999).  *See also Wolberg v. AT&T Broadband Pension Plan*, 2005 WL 23683, *4 (10th Cir. 2005) (unpublished) ("This case presents a situation where there may be what could be termed a standard conflict of interest because the plan administrator and members of the Committee are employees and, presumably, participant/beneficiaries of their employer's self-funded plan.").  The *Kimber* ruling stands in contrast to those cases in which the plan is administered by an insurance company in the business of providing disability insurance.  In those cases, the outcome of each claim has a direct effect on the insurance company.  *See Fought*, 379 F.3d at 999; *Omasta v. The Choices Benefit Plan*, 352 F. Supp. 2d 1201, 1205 (D. Utah 2004); *Smith v. Metropolitan Life Insurance Company*, 344 F. Supp. 2d 696, 702 (D. Colo. 2004).

The Court finds that the Plan Administrator had no financial stake in the outcome of the disability claim in this case and that the economic impact on Qwest would have been minimal if the claims were granted.  Therefore, the Court regards the conflict in this case as a "standard" one which must be considered as a factor in determining whether Qwest's denial of disability benefits to Plaintiff was arbitrary and capricious.  The Court will not, however, shift the burden to the Defendant to prove its decisions were not arbitrary and capricious.

The Court determines that the same standard of review applies to the Plan Administrator's decision to deny benefits under the Pension Plan.  Like the Disability Plan, the disability portion of the Pension Plan is administered by the EBC, which is composed of U.S. West employees.  Pension Plan, Art, VIII, ¶ 8.4.  The funding for disability pension benefits comes from a trust established to pay pension benefits and managed by the Investment Committee.  *Id.* Art. VIII ¶ 8.8(b), Art. IX.  The Pension Plan, therefore, is self-funded by the trust.  Though the Plan Administrators are, again, company employees, there is no proof that their compensation is tied to denial of benefits.  In fact, the Plan provides that members of the EBC will not be compensated for their services.  *Id.* Art. VIII ¶ 8.4.  Neither is there evidence that granting benefits would economically impact Qwest.  Therefore, Plaintiff has failed to prove more than the "standard" conflict of interest, which will be taken into account as a factor in arbitrary and capricious review.

In sum, the Court will apply an arbitrary and capricious standard of review to the decisions of the Plan Administrators.  The Court's review is limited to "determining whether the plan administrator's interpretation was reasonable and made in good faith," *Fought*, 379 F.3d at 1003, considering the conflict of interest as a factor in the process.

## FINDINGS OF FACT

### *The Plans*

1.  The Plaintiff, employed by U.S. West for 24 years, was a participant in the Disability Plan.  The Disability Plan provides that participants will be eligible for short-term disability

("STD") benefits if they are: (1) disabled and (2) fulfill several other procedural requirements, such as providing documentation supporting total disability, including "the plaintiff's subjective complaints or 'story of illness'; the objective, measurable or reproducible findings from physical examination and supporting laboratory or diagnostic tests; assessment or diagnostic formulation; and a plan for treatment or management of the problem."  Disability Plan, Art. IV ¶ 4.1.  The Disability Plan defines "disabled" as "when a Participant is unable to perform the normal duties of his regular job or other job duties in a modified capacity due to an injury or illness which is supported by objective medical documentation."  *Id.* Art. I ¶ 1.12.  Objective findings are defined as "written documentation of observable, measurable and reproducible findings of symptoms, such as, but not limited to, x-ray reports, elevated blood pressure readings, and lab test results."  *Id.* Art. I ¶  1.25.  The Disability Plan also imposes a seven day waiting period for STD benefits.  *Id.* Art. IV ¶ 4.2.  In other words, benefits will not be paid for the first seven days, and will commence on the eighth day of disability.

    2.  The Plaintiff was also denied a disability pension under the Pension Plan.  The Pension Plan provides, "A Participant whose Term of Employment is 15 years or more, *who has become Disabled and who Terminates with the Participating Company on account of the Disability*, shall be entitled to a disability pension."  Pension Plan, Art. V-A ¶ 5A.2 (emphasis added).  Under the Pension Plan, "Disabled" means,

> A Participant who is an Occupational Employee shall be considered to be Disabled
> under this Plan if the Participant *has become totally disabled as a result of sickness
> or injury*, other than, prior to January 1, 1993, by accidental injury arising out of and

-10-

in the course of employment by a Participating Company.  For periods on and after November 7, 1994, the Disabilty of an Occupational Employee who is not subject to collective bargaining shall be determined pursuant to the provisions of subsection 1.15(ii).

*Id.* Art. I, ¶ 1.15(i) (emphasis added).[2]

*Plaintiff's First Claim for Benefits*

3.   Between 1993 and 1997, the Plaintiff was injured in four separate car accidents, giving rise to her neck and back troubles.  *Administrative Record* ("A.R.") at 511.  The Plaintiff had taken leave from her job at U.S. West in the past for her back condition and had been granted STD benefits on at least one previous occasion – from June 9, 1997 to September 19, 1997.  *Id.* at 230, 259.  By February 27, 1998, Plaintiff had been diagnosed with "significant degenerative changes to her cervical spine."  *Id.* at 823.  The Plaintiff had also been previously diagnosed with scoliosis.  *Id.* at 511, 823.  The Plaintiff's back pain was treated with epidural blocks in her spine, each of which, according to the Plaintiff, was supposed to alleviate her pain for six to seven months.  *Id.* at 536.  The Plaintiff claims that the epidurals had become less

_____

[2] Prior to the Court's decision in this case, it contacted both plaintiff and defense counsel for clarification on the applicable definition of "disability" in the Pension Plan.  Originally, the Defendant had cited the definition of "disability" in the Modified Disability Pension Plan, set forth in Appendix J to the Pension Plan.  Defendant now points out that it was incorrect in quoting the definition of "disability" in the Modified Disability Pension Plan, because the Modified Plan applies only to management employees, not occupational employees.  According to the Qwest's records, the Plaintiff was an occupational employee.  Aff. of Judith Osse, ¶ 6. Pension Plan, Appx. J, Section 2 ¶ 2.12 (defining "Participant" as "any employee who is a Management Employee").  The definition of "disability" applicable to the Plaintiff, an occupational employee, comes from the main body of the Pension Plan.  *Id.* Art. I, ¶ 1.15(i).

effective over time at relieving her pain and presented the risk of deteriorating her bone

structure.  *Id.*  The Plaintiff had her last epidural block before filing for STD benefits in this case

in December of 1998.  *Id.*

     4.  On February 23, 1999, the Plaintiff saw her treating physician Joella Tadian, M.D.

complaining of headaches and shoulder pain.  *Id.* at 1010.

     5.  On February 24, 1999, Plaintiff notified U.S. West of her need to take leave under the

Family and Medical Leave Act ("FMLA") due to a "serious health condition."  *Id.* at 1025-26.

     6.  The Plaintiff saw Dr. Tadian on a regular basis after her February 23, 1999 visit.  A

week after requesting FMLA leave, the Plaintiff reported to Dr. Tadian that her shoulder pain

was improving and that she had not had a headache for a week.  *Id.*  On March 12, 1999, she

reported to Dr. Tadian that she was still having headaches and that she was experiencing neck

and shoulder pain.  *Id.* at 1011.  On March 29, 1999, the Plaintiff told Dr. Tadian that she had

severe lower back pain and shooting pain.  *Id.* at 1012.  Dr. Tadian evidently determined that the

epidural blocks, physical therapy, and other medications had ceased to be effective in relieving

the Plaintiff's pain and she referred the Plaintiff to an acupuncturist, Ximin Xu, D.O.M.  *Id.* at

1009.

     7.  On March 29, 1999, the Plaintiff and Dr. Tadian completed the required

documentation for the FMLA leave originally requested on February 24.  *Id.* at 1027-32.  Dr.

Tadian stated in the Plaintiff's Medical Leave Request that the medical facts supporting

Plaintiff's "Serious Health Condition" were: (1) Severe pain in the left neck and shoulder, with

x-rays confirming degenerative disc disease and neural foramina encroachment; (2) low back

pain due to a herniated disc; and (3) migraine headaches.  *Id.* at 1030.  The Medical Leave

Request indicated that the Plaintiff would be "continuously incapacitated" from March 29, 1999

through March 31, 1999 and that she could expect to be "intermittently incapacitated" for about

three to six days per quarter thereafter.  *Id.*  Presumably, the leave was granted, as the Plaintiff

did not work from March 29 to March 31.  *See id.* at 955.

      8.  Beginning on April 8, 1999, the Plaintiff was again absent from work.  *Id.* at 976.  Dr.

Tadian, in a letter to U.S. West Medical dated April 8, 1999, explained that the Plaintiff was

experiencing low back pain and left neck pain due to a herniated disc "to the extent that she can

no longer do her job."  *Id.* 1042.  The Plaintiff worked as a sales consultant at U.S. West, and Dr.

Tadian noted, "The space occupied by her desk requires her to twist her body and turn her head

to the right which causes muscle spasms in her neck and aggrevates [sic] the sciatic nerve in her

lower back.  The pain, both in her neck and in her lower back is at this time incapacitating."  *Id.*

Dr. Tadian requested a one-month medical leave of absence for the Plaintiff, stating that Dr. Xu

had recommended that the Plaintiff rest between weekly acupuncture treatments and that they

were going to try this new method of treatment to see if it led to any improvement.  *Id.*

      9.  Over the course of the next month, while receiving acupuncture from Dr. Xu, it

appeared that the Plaintiff's lower back pain was alleviated to some degree, but she began to

report increasing neck pain.  *Id.* at 1012-13.  On April 14, the Plaintiff stated that after her last

treatment her low back pain had improved "a lot."  *Id.* at 1013.  On April 21, 1999, the Plaintiff

reported, "after the treatment her low back pain ha[d] gone [for a] few days and then came

back." *Id.* at 1013.  She hold Dr. Tadian, "the more I do, the worse I get."  *Id.*  She also told Dr.

Tadian she was experiencing neck and shoulder pain.  Dr. Xu's treatments appeared to alleviate

her back and neck pain for a brief time period after each visit and then the symptoms would

return.  *Id.*

10.  On April 19, 1999, Plaintiff and Dr. Tadian completed a Disability Medical

Certificate, indicating that absences would be expected from April 8, 1999 to May 8, 1999, due

to the Plaintiff's lower back pain and herniated disc, with "intermittent incapacity" to be

expected upon her return to work.  *Id.* at 1055-56.  Both Hollie LaGrotta, U.S. West's Health

Services case manager, and Anne Hazelton, M.D., a contracted medical consultant, reviewed the

Plaintiff's request for STD benefits.  *See id.* at 976-78.  After speaking with the Plaintiff, neither

could understand what had changed in the Plaintiff's condition that would make her disabled, but

neither spoke with Dr. Tabian or Dr. Xu.  *Id.*  Apparently, messages were left at Dr. Tadian's and

Dr. Xu's.  On April 22, Ms. LaGrotta wrote, "Will see if either provider responds to Dr.

Hazelton prior to denial to see if there is any other info relevant to disability."  *Id.* at 976.  But,

on April 23, Ms. LaGrotta noted, "No response from providers - case denied."  *Id.*  Dr. Hazelton

had concluded on April 21, that the Plaintiff's condition was "chronic - without event to

worsen," *id.* at 978, and both she and Ms. LaGrotta recommended that STD benefits be denied.

*Id.* at 976, 978.

11.  With regard to the Plaintiff's complaint that her workspace was contributing to her

condition, Ms. LaGrotta noted that the Plaintiff had previously had an ergonomic evaluation by Jim Stewart. *Id.* at 976. The Plaintiff denies that any such evaluation was ever performed, *id.* at 990, and the record confirms that no such evaluation was done. In fact, Ms. LaGrotta was informed by a union representative in June of 1999 that no formal ergonomic evaluation had ever been done because the employee had allegedly been non-compliant and had turned down the evaluations. *Id.* at 528. Even though an official ergonomic evaluation was never peformed, the Plaintiff was offered a new and ergonomically improved desk on April 2, 1999 by her supervisor, Joe Kersul. *Id.* at 534, 976, 990. The new desk offered the Plaintiff the same feature as her present desk, in that it could be raised or lowered to accommodate working from both seated and standing positions. *Id.* at 534, 990. The new desk, however, could only be adjusted manually, unlike the Plaintiff's, which could be adjusted electronically. *Id.* Though Mr. Kersul advised the Plaintiff that a co-worker could assist her in changing the position of her new desk, the Plaintiff refused to try the desk. *Id.* She stated that there would have been no way a co-worker could have helped reposition her desk throughout the day, as all employees were tethered to their computers. *Id.* at 990. She also noted that the trouble with her desk was that it was necessary to constantly turn to her right to answer the phone and access supplies and documents, a problem which would not have been solved by the new desk. *Id.* In addition, her workspace was so small that when she worked standing up, her chair would be pushed into the aisle, creating a hazard for other employees walking by. *Id.*

      12. In a letter dated April 23, 1999, only four days after the Plaintiff applied for STD

benefits, U.S. West denied the Plaintiff's request for STD benefits.  The reasons for the denial

were as follows,

> Medical documentation submitted does not substantiate total disability. Documentation submitted contains insufficient findings to substantiate the inability to perform *any* work.

> Documentation must include the "story of illness" or subjective complaints, objective (measurable and reproducible) findings from physical examination and laboratory or diagnostic tests, assessment (and diagnostic formulation), and a plan for treatment or management of the problem.

*Id.* at 965 (emphasis added).

13.  After the denial of STD benefits, Dr. Tadian returned Dr. Hazelton's phone call.  Dr.

Tadian related that the Plaintiff should not return to work because her desk exacerbated her

scoliosis.  *Id.* at 986.  Dr. Hazelton told Dr. Tadian that an ergonomic evaluation had been done

and that the Plaintiff's work station should be safe for her return to work.  *Id.*  Dr. Xu also

returned Ms. Hazelton's call.  *Id.*  On May 3, 1999, Dr. Hazelton spoke with Dr. Xu who

indicated that he had only suggested the Plaintiff take a week off of work, not a month.  *Id.*

During this period, the Plaintiff continued to be treated by Dr. Xu.

14.  On May 20, 1999, the Plaintiff appealed the denial of STD benefits.  *Id.* at 536.  In

her appeal, Plaintiff stated that she was "totally unable to work because of the following

conditions:  (1) Pain, (2) My inability to do my job because of pain medications[, and] (3) My

doctor said that if I returned to work it would make me relapse and loose [sic] all the progress

that is being made."  *Id.*  The Plaintiff also explained that the reason she had been able to work in

-16-

the past was that she had been receiving spinal epidural blocks, a treatment that had become less effective and could not continue indefinitely. *Id.* She also explained how her workstation was contributing to her problems at work. *Id.*

15. On May 25, 1999, U.S. West sent a letter acknowledging the Plaintiff's appeal and giving her until June 8, 1999 to submit additional information to the Reviewer. *Id.* at 522. The Plaintiff submitted the notes of Dr. Tadian which indicated that on April 29, 1999, the Plaintiff's back pain was constant and she was using a cane to walk. *Id.* at 570. A May 4, 1999 physical therapy note indicated that the Plaintiff needed physical therapy three times per week for four weeks, and again explained the role of the Plaintiff's workstation in worsening her condition. *Id.* at 574-75. The physical therapist noted that the Plaintiff had "severe increased muscle tension" in the shoulders and back. *Id.* at 574. On May 21, 1999, the Plaintiff discussed having another epidural and possible surgery with Dr. Tadian. *Id.* at 577.

16. After receiving her appeal, Ms. LaGrotta spoke with the Plaintiff. *Id.* at 527. The Plaintiff explained that she had been on her current medication for years, since her back problems began in 1993. *Id.* She also stated that for the past seven months she had also been using the new medications of Ultram, Ibuprophen with Cytotec, and Darvocet N. *Id.* She told Ms. LaGrotta that the reason she could not work was because her work station had not been properly modified. *Id.* She also related to Ms. LaGrotta that she had had another epidural on May 21, 1999. *Id.* After reviewing only one additional note submitted by Dr. Tadian, Dr. Hazelton again recommended on June 2, 1999, that U.S. West deny STD benefits, stating that

-17-

despite the fact that the Plaintiff had scoliosis, muscle spasms, headaches, and lower back pain, there had been no increase in any of her medication for at least seven months, she was not on a narcotic, and she slept through the night.  *Id.* at 532.  Dr. Hazelton concluded, "I still do not see how she is worse than when she was able to work."  *Id.*

17.  The Plaintiff's appeal was denied by an Appellate Reviewer on July 1, 1999 and she was notified of the denial on July 13, 1999.  *Id.* at 523, 520.  The reviewer noted that the "employee had a chronic condition related to scoliosis and herniated discs."  *Id.* at 523.  The reasons for the denial were: (1) the acupuncturist did not recommend missed time from work; (2) the Plaintiff's complaints are of subjective pain; (3) the Plaintiff has been on current medications for an extended period of time with no new pain medications; (4) the Plaintiff's missed time has been for treatment, not disability; and (5) the Plaintiff has been denied Workers' Compensation. *Id.*  The letter to the Plaintiff dated July 13, 1999 stated the reasons for denial as follows:

> While your Provider may have given a recommendation regarding a return to work date that differs from the date STD benefits have been denied, the medical documentation submitted does not substantiate Disability . . . beyond the date STD benefits were denied.
>
> Documentation from your Provider must show your "story of illness" . . . and be consistent with your inability to perform *any* job within the Company (including *any* job in which duties may be modified).

*Id.* at 520 (emphasis added).  The letter noted that the epidural blocks Plaintiff received on May 21, 1999 and May 22, 1999 would have been covered but were subject to the seven day waiting period.  *Id.*

18.  On July 20, 1999, U.S. West sent the Plaintiff a letter informing her that she had exhausted her entire twelve weeks of FMLA leave.  *Id.* at 205.  According to U.S. West, the Plaintiff's options were to (1) return to work with reasonable accommodations being made, (2) present evidence of permanent medical restrictions, which would prompt U.S. West to search for another position within the company for her, or (3) request unpaid leave if she did not feel she could perform any position within the company.  *Id.*  The Plaintiff requested unpaid leave.

*Plaintiff's Second Claim for Benefits*

19.  Over the summer, the Plaintiff began treatment of her back and neck with Keith Harvie, D.O.  An x-ray report on August 11, 1999, noted findings of significant scoliosis, foraminal stenosis at C4-5, C5-6 and C6-7, as well as marked degenerative disc disease at L3-4, L4-5 and L5-S1.  *Id.* at 507.  An MRI had also been performed in anticipation of the Plaintiff's appointment, which found a new disc protrusion at L2-3.  *Id.* at 797.  Dr. Harvie concluded that the Plaintiff needed to have selective nerve root blocks on the left side of her cervical spine and discograms at the L3-4, L4-5, and L5-S1 levels.  *Id.* at 507.  On August 18, 1999, the Plaintiff underwent a discogram and CT scan.  *Id.* at 506.  Dr. Harvie observed that the discogram/CT scan did "demonstrate abnormalities," but these were not "consistent with her pain."  *Id.*  Dr. Harvie recommended that the Plaintiff have nerve blocks performed at the L3-4 and L4-5 levels.  *Id.*  The Plaintiff returned to Dr. Harvie on September 17, 1999, after having had a portion of the nerve blocks.  *Id.* at 498.  Dr. Harvie concluded that the Plaintiff would need to have back surgery before she would be able to return to work and gave her a slip stating she should be off

work until further notice, as Dr. Harvie did not feel that she would be able to work "at this time." *Id.* at 498-99.

20. The Plaintiff had gone to see William Harrison, M.D., on August 12, 1999, who diagnosed the Plaintiff with an ovarian cyst. *Id.* at 503. The Plaintiff had surgery to remove her ovaries on September 20, 1999. *Id.* at 504. On September 23, 1999, the Plaintiff notified U.S. West of the surgery. *Id.* at 441. The Plaintiff's personal leave was set to expire on September 29, 1999, and U.S. West informed the Plaintiff that they could begin to code her as out ill rather than on personal leave starting that day. *Id.* U.S. West also informed the Plaintiff that if there was objective evidence of disability after September 29, 1999, they could allow her to receive STD benefits beginning October 6, 1999, after the seven day waiting period had elapsed. *Id.* A note from Dr. Harrison on September 27, 1999, however, stated that the Plaintiff would be able to return to work on October 1, 1999, before the Defendant alleged that the Plaintiff would become eligible for benefits. *Id.* at 487. On October 1, 1999, however, the Plaintiff saw Dr. Harrison due to postoperative complications. *Id.* at 473. Dr. Harrison's nurse noted that the Plaintiff was oozing dark blood and that her abdomen was quite bruised, but she also described the Plaintiff as "quite lively and feels well." *Id.* This information was reviewed by Ron Sellers at U.S. West who concluded that the Plaintiff did not qualify for STD benefits. *Id.* at 440-41. On October 7, 1999, Dr. Harrison wrote a new return to work note that stated that due to complications with surgery, the Plaintiff could not return to work until October 11, 1999. *Id.* at 449. Earlier that day, however, U.S. West had already denied STD benefits. *Id.* at 454.

21.  The reasons provided for denial were the exact same reasons, word for word, that

were provided for denial of the Plaintiff's first appeal:

> While your Provider may have given a recommendation regarding a return to work
> date that differs from the date STD benefits have been denied, the medical
> documentation submitted does not substantiate Disability . . . beyond the date STD
> benefits were denied.
>
> Documentation from your Provider must show your "story of illness" . . . and be
> consistent with your inability to perform *any* job within the Company (including *any*
> job in which duties may be modified).

*Id.* (emphasis added).

22.  After benefits were denied, the Plaintiff continued to see Dr. Harvie, anticipating her

upcoming neck and back surgery.  *Id.* at 783, 780.  On November 1, 1999, the Plaintiff was

approved for neck surgery, *id.* at 780, which was scheduled for December 14, 1999.  *Id.* at 805.

She also saw Dr. Harrison's nurse again on October 18, 1999, who described her incision as

healing well and stated, "She is to continue at home until 6 weeks postop with restrictions."  *Id.*

at 771.  The Plaintiff appealed the denial of benefits on November 9, 1999 and U.S. West

informed her that any additional information she would like to be considered had to be submitted

by November 23, 1999.  *Id.* at 773.  The Plaintiff sent the Reviewer a letter on November 17,

1999 and attached medical records that were already in U.S. West's file.  *Id.* at 805- 53.

Despite the fact that the Plaintiff failed to send any new documents to the reviewer on

November 17, the record reflects that U.S. West had in its possession medical records from Dr.

Harvie for November 19 and December 10, 1999.  On November 19, 1999, Dr. Harvie wrote that

the Plaintiff would undergo neck surgery on December 14, 1999, and that she would not return

to work until January 3, 2000.  *Id.* at 865.  On December 10, 1999, however, when the Plaintiff

saw Dr. Harvie for her pre-operative review, he informed her that surgery was no longer

indicated.  *Id.* at 858.  Due to the apparent success of the selective nerve blocks that had been

administered, Dr. Harvie determined that more nerve root blocks should be performed rather

than surgery.  *Id.*  Dr. Harvie indicated that the Plaintiff should remain off work until further

notice.  *Id.*

 23.  On December 23, 1999, the Plaintiff's appeal was denied.  Again, the stated reason

for denial, identical to the reason for denial of her first appeal appeared:

> While your Provider may have given a recommendation regarding a return to work
> date that differs from the date STD benefits have been denied, the objective medical
> informaiton provided is insufficient to substantiate Disability . . . beyond the date
> STD benefits were denied.

> Documentation from your Provider must show your "story of illness" . . . and be
> consistent with your inability to perform any job within the Company (including any
> job in which duties may be modified).

*Id.* at 753.  Apparently, no further investigation of the Plaintiff's claim was done while her

appeal was pending.

*Plaintiff's Claim for Disability Pension*

 24.  After the Plaintiff's second appeal was denied, she continued to seek treatment with

Dr. Harvie.  Dr. Harvie sent the Plaintiff for a second opinion and evaluation with Claude D.

Gelinas, M.D., in January of 2000.  *Id.* at 670-73.  Dr. Gelinas reviewed the Plaintiff's medical

history, examined her, and concluded,

> She has chronic cervical and lumbar pain, right groin pain of unknown etiology, but no evidence of significant spinal nerve root compression. . . . I am of the opinion that any surgical intervention in this patient would not provide her with any significant relief of her symptoms. . . . I really think this is a pain management issue with her, and it should be treated as such. . . . In addition, my general feeling with her is that this patient had such severe cervical and lumbar generative changes that she is essentially unemployable. . . . I think [her condition is] more related to degenerative aging than to any specific work related injury.

*Id.* at 673.  Based in part of Dr. Gelinas' opinion, the Plaintiff was awarded Social Security

disability benefits on March 18, 2000.  *Id.* at 698-701.  The Social Security Administration found

that the Plaintiff had become disabled under their standards on April 2, 1999.  *Id.* at 698.

25.  During a visit to Dr. Harvie on May 5, 2000, the Plaintiff reported that she had been

in a motor vehicle accident on April 15, 2000 in which a parked vehicle had backed into her

while she was moving.  *Id.* at 685.  Dr. Harvie described the accident as exacerbating her prior

condition.  *Id.*  The Plaintiff again visited Dr. Harvie on June 16, 2000 and stated she had been in

another accident on June 5, 2000.  *Id.* at 680.  The Plaintiff claimed that a Ford Explorer had

backed into her while she was in a parking lot and the accident had caused further pain in her left

arm and left shoulder.  *Id.*

26.  On June 15, 2000, U.S. West wrote to Plaintiff in order to clarify her employment

status.  *Id.* at 743.  The letter notified the Plaintiff that she would have been on leave for twelve

months on July 28, 2000 and that on July 31, 2000, if she did not return to work, she would be

separated from the payroll.  *Id.*  On July 19, 2000, the Plaintiff spoke with Kelly Candelaria,

Qwest's long-term disability manager, and informed her she would be seeking a Disability Pension. *See id.* at 735.  The Plaintiff did not return to work before July 31 and was removed from the payroll.  On August 3, 2000, Ms. Candelaria sent to the Plaintiff the necessary forms for application for a Disability Pension.  *Id.*

27.  The Plaintiff applied for a Disability Pension on August 8, 2000.  *Id.* at 665.  Dr. Harvie completed a portion of the application, diagnosing the Plaintiff with degenerative disc disease of the cervical and lumbar spine, chronic pain syndrome, and drug habituation.  *Id.* at 666.  Dr. Harvie concluded that the Plaintiff had a "severe limitation of functional capacity" which made her incapable of performing even minimal sedentary work.  *Id.* at 667.  Dr. Harvie determined that the Plaintiff was totally disabled.  *Id.*

28.  After reviewing the application and supporting materials, Qwest determined it needed additional information and scheduled the Plaintiff for two independent medical evaluations, one physical and one psychiatric, and a functional capacity evaluation.  *Id.* at 733. J. William Wellborn, M.D., performed the physical evaluation.  Dr. Wellborn noted, after his examination, that Plaintiff showed mild to moderate degenerative changes to the cervical spine and degenerative changes of the lumbar spine, most prominently at L4-L5.  *Id.* at 651.  Dr. Wellborn also recognized longstanding scoliosis in the upper and mid thoracic spine.  *Id.* Nevertheless, Dr. Wellborn opined that these factors "would not explain the level of pain and disability that is reported by Ms. Suazo-Abeyta."  *Id.* at 652.  Finally, he concluded, "I find no medical basis to prevent Ms. Suazo-Abeyta from working as a sales consultant for her previous

employer.  She could probably work at least at a sedentary work level." *Id.*

29.  Theodore J. Scharf, M.D., completed the psychiatric evaluation of the Plaintiff on

October 30, 2000.  He concluded,

> There is nothing in the history or presentation that would suggest a mental disorder. Therefore, there is no psychiatric diagnosis.
>
> It would appear that the most likely finding in this case would be a description of symptom magnification which has convinced Ms. Suazo-Abeyta that she is unable to perform her usual duties of her employment.
>
> From a psychological perspective, there is no contraindication to Ms. Suazo-Abeyta working full time as a sales consultant with US West or, in fact, in any other similar position.

*Id.* at 624.

30.  The function capacity evaluation report, performed by Novacare Outpatient

Rehabilitation, stated,

> Ms. Suazo-Abeyta demonstrated inconsistencies in pain reports and pain behaviors. She reported pain into the Left capular area with squatting, which did not involve any use of the shoulder or scapula.  She walked without a limp during uninstructed gait, yet walked with a limp during instructed gait and carrying.  Her limp during those activities was indicative of a left leg problem, not a right leg problem as reported.

*Id.* at 635.  In conclusion, the report held, "Ms. Suazo Abeya is capable of SEDENTARY work

based on the capabilities demonstrated during the FCA."  *Id.*

31.  On December 29, 2000, the Plaintiff's application for Disability Pension was denied,

for the following reasons:

> A review of medical records prior to your termination from the payroll did not

> provide sufficient objective medical evidence that you were disabled, and subsequent Independent Medical and Psychiatric Evaluations (IME's) were requested.
>
> The results from the IME's performed on October 30, 2000 by Theodore J. Scharf, M.D. and J. William Wellborn, M.D. state you are able to perform sedentary work, including your previous job of Sales Consultant. These findings indicate you are not Disabled as defined by the Plan.

*Id.* at 618. The letter declared that the denial was based on the following definition of "disability,"

> A Participant who is an Occupational Employee shall be considered to be Disabled under this Plan if the Participant has become totally disabled as a result of sickness or injury, other than, prior to January 1, 1993, by accidental injury arising out of and in the course of employment by a Participating Company. For periods on and after November 7, 1994, the Disability of an Occupational Employee who is not subject to collective bargaining shall be determined pursuant to the provisions of subsection 1.15(ii).

*Id.* Although the letter stated that the Plaintiff had the opportunity to appeal the decision, she did not.

32. The Plaintiff brought this action on January 18, 2002, alleging violation of ERISA. On December 2, 2002, Qwest filed its motion for summary judgment. The Plaintiff filed her cross-motion for summary judgment on January 17, 2003. The administrative record was filed in conjunction with the motions.

### CONCLUSIONS OF LAW

*Plaintiff's Applications for STD Benefits*

1. Based on the facts, as outlined above, the Court concludes that the Defendant's decision to deny the Plaintiff benefits under the Disability Plan was arbitrary and capricious and

unreasonable.

2.   The Court finds dispositive the fact that the standard for disability quoted by Qwest in each denial letter substantially differed from the definition of disability set forth in the Disability Plan.  The Disability Plan defines "disability" as "when a Participant is unable to perform the normal duties of his regular job or other job duties in a modified capacity due to an injury or illness."  Disability Plan, Art. I ¶ 1.12.  In contrast, each letter denying STD benefits required the Plaintiff to demonstrate "the inability to perform *any* work," A.R. at 965 (emphasis added), or the "inability to perform *any* job within the Company (including *any* job in which duties may be modified)," *id*. at 520, 454, 753 (emphasis added).  The definition in the Disability Plan only requires the participant to demonstrate that she cannot perform the normal duties of her "own" job or other job duties in a modified capacity.  It does not require her to prove that she cannot perform "any work," or "any job" in which duties may be modified.  It was error for the Plan Administrator and Reviewers to require the Plaintiff to meet this higher standard.

3.   The Tenth Circuit in *Caldwell v. Life Insurance Company of North America*, recognized the distinction between "own occupation" and "any occupation" benefits.  287 F.3d 1276, 1284 (10th Cir. 2002).  In *Caldwell*, the plaintiff was entitled to benefits if he could show that he was "unable to perform all the essential duties of his occupation."  *Id.* at 1283.  In denying benefits, the reviewer relied on the findings of the administrative law judge in the plaintiff's worker's compensation case and the findings in the plaintiff's Social Security disability case.  *Id.*  The court noted that the standard for receiving both worker's compensation

benefits and Social Security disability was that the plaintiff show that he could not perform "any" job for which he was qualified. *Id.* at 1284. As such, the Tenth Circuit decided it was error to for the reviewer to rely on the results in the worker's compensation and Social Security disability cases. *Id.*

4. The Plan Administrator in Plaintiff's case, made the same mistake as the reviewer in *Caldwell*. The wrong standard was applied. While true that the Plan Administrator of the Disability Plan had "the right and discretion to determine for all parties, all matters of fact or interpretation relating to the administration of Plan provisions, including questions of eligibility and any other matters," Disability Plan, Art. II ¶ 2.2, the discretion to interpret the Plan's provisions did not give the Plan Administrator the discretion to change an "own job" standard to an "any job" standard. The Plan Administrator must be constrained by the terms of the Plan, which required only that the Plaintiff demonstrate that she was unable to perform regular duties of her own job, or other job duties in a modified capacity, not *any* job, or *any* job in which duties may be modified.

5. Even if it was within the Plan Administrator's discretion to interpret "the normal duties of his regular job or other job duties in a modified capacity" as "*any* job within the Company (including *any* job in which duties may be modified)," there is no evidence in the record that the Defendant attempted to determine whether the Plaintiff would be able to perform "any" job within the Company in which duties could be modified. The Plaintiff was never offered a modification of her job duties or another job in the company that would accommodate

her condition.

      6.  The Court notes that there is no evidence that the standard conflict of interest in this case played a role in the Plan Administrator's decision to deny benefits.

      7.  The Court will offer no opinion as to whether the documentation submitted by the Plaintiff in support of STD benefits represents sufficient evidence of disability under the appropriate standard.  The Court will remand to the Plan Administrator for Qwest's Disability Plan to make that determination.  Nevertheless, the Court notes that it is troubled by the result of the Plaintiff's second request for STD benefits.  The Defendant had indicated to the Plaintiff that it would consider her for STD benefits while she was recovering from the surgery to remove her ovaries.  That surgery took place on September 20, 1999.  For some inexplicable reason, however, the Defendant determined it would classify the Plaintiff as on personal leave until September 29, rather than beginning to code her as out ill on September 20, the day of the surgery.  In addition, though understandable that Qwest first determined that the Plaintiff would not be disabled after October 1, 1999, the date Dr. Harrison stated she could return to work, it is less clear why on appeal the reviewer did not rely on Dr. Harrison's followup note that stated the Plaintiff would have to remain at home until October 11, 1999 due to complications with the surgery.  The Court asks the Plan Administrator to consider these issues in its reconsideration of whether the Plaintiff was eligible for STD benefits.

*Plaintiff's Application for Disability Pension Benefits*

      8.  The Court concludes that the Defendant's decision to deny Disability Pension benefits

to the Plaintiff was not arbitrary and capricious.  Pursuant to the Pension Plan, the Plaintiff was required to show that she had become "totally disabled as a result of sickness or injury," and that her termination with Qwest was "on account of the Disability."  Pension Plan, Art. I, ¶ 1.15(i); Art. V-A ¶ 5A.2.  In support of her claim, the Plaintiff submitted the opinion of Dr. Harvie who stated that the Plaintiff had a "severe limitation of functional capacity" which made her incapable of performing even minimal sedentary work.  *Id.* at 667.  Dr. Harvie determined that the Plaintiff was totally disabled.  *Id.*

9.  Concluding that there was insufficient information to award Disability Pension benefits, Qwest requested that independent medical evaluations be performed.  Dr. Wellborn, who performed the physical evaluation, recognized that the Plaintiff had mild to moderate degenerative changes to the cervical spine, degenerative changes of the lumbar spine, and longstanding scoliosis in the upper and mid thoracic spine.  *Id.* at 651.  Nevertheless, Dr. Wellborn concluded that these factors "would not explain the level of pain and disability that is reported by Ms. Suazo-Abeyta."  *Id.* at 652.  Dr. Wellborn found "no medical basis to prevent Ms. Suazo-Abeyta from working as a sales consultant for her previous employer.  She could probably work at least at a sedentary work level."  *Id.*  Dr. Scharf, who conducted the psychiatric evaluation found it most likely that the Plaintiff suffered from "symptom magnification which has convinced Ms. Suazo-Abeyta that she is unable to perform her usual duties of her employment."  *Id.* at 624.  The physical therapist's report revealed "inconsistencies in pain reports and pain behaviors," and concluded that the Plaintiff "is capable of SEDENTARY work

based on the capabilities demonstrated during the [functional capacity evaluation]." *Id.* at 635.

10.  Qwest did not err in relying on the results of the independent medical evaluations to deny the Plaintiff benefits.  The Tenth Circuit has noted, that "while not required, independent medical examinations are often helpful." *Fought*, 379 F.3d at 1015.  Quoting the Seventh Circuit's decision in *Highshue v. AIG Life Ins. Co.*, the court wrote that "[s]eeking independent expert advice is evidence of a thorough investigation." *Id.* (quoting *Highshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998)).  In this case, Qwest chose to seek independent medical advice.  All three evaluators concluded that the Plaintiff could perform sedentary work.  Faced with the contradicting opinions of the independent evaluators and Dr. Harvie, it was not arbitrary for the Plan Administrator, in its discretion, to rely on the opinions of the three disinterested evaluators.

THEREFORE, it is hereby

**ORDERED** that the Plaintiff's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part and Defendant's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

It is hereby further **ORDERED** that this matter is **REMANDED** to the Plan Administrator for Qwest's Disability Plan to reconsider the record and determine whether Plaintiff was disabled under the definition of "disability" provided in the Disability Plan.

DATED this _____ day of September, 2005.

_____
United States District Judge