# United States District Court
## For The District of New Mexico

DARLENE SUAZO-ABEYTA,     )
                                 )
        Plaintiff,          )
                                 )
vs.                            )      Case No. 02-CV-00066-WFD
                                 )
QWEST CORPORATION,      )
                                 )
        Defendant.     )

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

### I. Procedural Background

This case originally came before the Court in 2002 as an appeal from a decision by Defendant Qwest's Disability Plan ("Plan") Plan Administrator ("PA") to deny Short Term Disability ("STD") benefits, as well as Long Term Disability ("LTD") benefits (a disability pension) requested by Plaintiff Suazo-Abeyta under the Plan, which is regulated by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*.  The parties submitted cross motions for summary judgment in the fall of 2002 regarding whether Defendant's denial of benefits was proper under ERISA.

On September 29, 2005, the Court found that Qwest's PA used the wrong definition of "disability" for the purposes of determining Plaintiff's STD benefits eligibility, and remanded the matter to the PA for reconsideration under the appropriate definition. However, the Court found that the PA's decision to deny Plaintiff's request for disability

pension was not arbitrary and capricious and dismissed her complaint on that limited issue.

On remand, the PA again determined that Plaintiff was not eligible for STD benefits, this time under the correct definition of "disability."  Now before the Court are a second round of cross summary judgment motions regarding the outcome of the remand.

## II.  Factual Background

Rather than repeat entirely the historical and medical context of this case, the Court adopts the Findings of Fact and Conclusions of Law made in its order ruling on the previous round of cross motions for summary judgment.  Findings of Fact and Conclusions of Law, 02-CV-66-WFD, filed September 29, 2005 (Dkt. 55) (hereinafter cited to as "FFCL").  The Court nonetheless highlights a number of relevant events and elements of evidence below.

Plaintiff was employed by Qwest or its predecessor, U.S. West, for 24 years as a customer service operator/data input technician.  She was a participant in Qwest's disability plan, which authorized STD benefits following a seven day waiting period, for employees who are disabled under the definition in the plan and fullfill certain requirements and obligations, including:

> Provide documentation supporting total Disability (or Disability requiring reduced hours) to Health Services within a reasonable period not to exceed three weeks from the first day of absence, and after each follow-up visit with a Provider (or as often as requested by Health Services).  Documentation

-2-

> must be from the original dated medical record and support the claim of total Disability (or partial Disability requiring reduced hours, if appropriate).  Such documentation shall include: the patient's subjective complaints or "story of illness"; the objective, measurable or reproducible findings from physical examination and supporting laboratory or diagnostic tests, assessment or diagnostic formulation; and a plan for treatment or management of the problem.

Disability Plan, Art. IV §§ 4.1(e) (hereinafter cited to as "Plan").  Under Qwest's plan, "disabled" or "disability" means:

> the circumstance when a Participant is unable to perform the normal duties of his regular job or other job duties in a modified capacity due to an injury or illness which is supported by objective medical documentation.

*Id.*, Art. I, § 1.12; Hazelton Aff. at 8.  "Objective" medical evidence includes "written documentation of observable, measurable and reproducible findings of symptom, such as, but not limited to x-ray reports, elevated blood pressure readings, and lab test results."  *Id.*, § 1.25.

In her requests for benefits, Plaintiff complained of numerous ailments, which she says totally precluded her from working during the relevant time periods, and which should have made her eligible for STD benefits.  These include neck, back and shoulder pain, as well as migraine headaches.  Her neck, back and shoulder pain may be a result, at least in part, from scoliosis, which she has had since she was a child; a surgery she had when she was three to remove part of a lung; and four car accidents, which took place between 1993 and 1997.  *Administrative Record* ("*A.R.*") at 510-511.  She had a hysterectomy in 1994, and also had her ileo-inguinal nerve cut on her right

side in an attempt to alleviate alleged leg pain and numbness.  *Id.* at 511.  She also had

ovarian removal surgery in September of 1999 while she was already off work on

unpaid personal leave.  *Id.* at 441, 487, 503-04.

Plaintiff further claims that her workspace "require[d] her to twist her body and

turn her head . . . [aggravating] the sciatic nerve in her lower back."  *Id.* at 1042.

Although Dr. Hazelton asserts in an affidavit that an ergonomic evaluation was

performed to assess whether her workspace could be corrected, the record actually

indicates that no such evaluation was ever performed.  *Id.* at 528 (referencing a phone

call from the ergonomic evaluator Dr. Hazelton asserts performed an evaluation, which

confirmed that he had not attempted to inspect Plaintiff's workspace because he had

been told by a labor union representative that Plaintiff would not be cooperative).

Nonetheless, it appears that Qwest made some effort to fulfill her workspace needs, for

instance offering her an "improved" desk, which she declined because she allegedly felt

she could not operate it and because of other workspace deficiencies.[1]  *Id.* at 526, 534,

976, 990.

By February 1998, Plaintiff's primary doctor diagnosed her with "significant

degenerative changes to her cervical spine."  *Id.* at 823.  She was treated with epidural

---

[1] The "improved" desk required manual adjustment; her existing desk was electrically
operated.  Plaintiff asserted she could not rely on co-workers to help her adjust the manual desk
during work, and that her only option was to maintain the status quo.  *A.R.* at 534, 990.
Additionally, Plaintiff stated that she was concerned that when the desk was in the standing
position, her desk chair would obstruct the flow of traffic in a nearby walkway.  *Id.* at 537.

nerve blocks in her spine; these were supposed to alleviate her pain for months at a time, but she claims they became less and less effective over time.  She had her last epidural block in December 1998, just before filing for STD benefits for the first time.  *Id.* at 536.  She also saw an acupuncturist with initially positive but decreasingly effective results as treatment progressed.  *Id.* at 1012-1013.  In December 1999, near the end of the relevant time period, another physician, Dr. Harvie, scheduled her for neck surgery.  However, he ultimately determined that while her discogram/CT scan did "demonstrate abnormalities," they were not "consistent with her pain," *id.* at 506, and determined that surgery was not "indicated."  *Id.* at 858.  Instead, he opted to continue the prior treatment methods.  *Id.*

During the relevant time period, Plaintiff was on and off of Family and Medical Leave Act ("FMLA") leave until she exceeded her maximum annual allowance.  She subsequently went on unpaid medical leave.  *Id.* at 205-07.  It appears from the record that Ms. Suazo-Abeyta was absent from work from March 29-31, as well as from April 8, 1999 until she was terminated from the payroll on July 31, 2000.  She applied for STD benefits, was denied, and appealed on two separate occasions, as set forth below.

**First STD Application**

**Applied**:     April 19, 1999
**Denied**:      April 23, 1999
**Appealed**:   May 20, 1999
**Denied**:      July 2, 1999

Ms. Suazo-Abeyta's first STD benefits application covered the "period beginning

April 8, 1999" and extending to an unknown future date.  *Id.* at 965 (Defendant's April 23, 1999 letter denying benefits).  The basis for her first STD application was related purely to her neck and back pain.  Her regular physician, Dr. Joella Tadian, reported that her x-rays confirmed degenerative disc disease and a herniated disc, and that she also had migraine headaches.  The doctor initially reported that Plaintiff would be "continuously incapacitated" from March 29-31, 1999, and "intermittently incapacitated" for three to six days per quarter thereafter.  *Id.* at 955.  Her doctor later reported that her low back pain was so severe "she can no longer do her job,"and that her workspace aggravated her condition.  On April 14, after receiving several weeks of acupuncture by Dr. Yimin Xu, D.O., Plaintiff reported that her back pain had improved "a lot," but she later reported that the improvement was only temporary, and that the "more I do, the worse I get."  *Id.* at 1013.  Upon questioning by Qwest, Plaintiff's acupuncturist noted that she should take a week (not a month as Plaintiff told Qwest) off from work.  *Id.* at 986.

Both U.S. West's Health Services Case Manager, Hollie LaGrotta, and a contracted reviewer for U.S. West, Dr. Anne Hazelton*,* commented that they could not determine what had made Plaintiff's condition worse than when she was able to work.  LaGrotta called both of Plaintiff's doctors (practitioner and acupuncturist) to see if they had any further relevant information to provide, but her calls were apparently not returned.  STD benefits were denied shortly thereafter.  *Id.* at 976.  However, neither

Hazelton nor LaGrotta ever personally examined Ms. Suazo-Abeyta; their conclusions were based solely on a review of information provided by Dr. Tadian, Dr. Xu and other Qwest Human Resources and Health Services officials.

During the pendency of her appeal, her doctor submitted additional information to the reviewers noting that Plaintiff needed a cane to walk, that her work station aggravated her condition, and that she needed physical therapy three to four times a week.  Qwest noted that although Plaintiff reported scoliosis, muscle spasms, headaches, and lower back pain, no changes had been made to her medications in seven months, she had not been prescribed any narcotics, and she apparently could sleep through the night.  *Id.* at 532.  Hazelton again recommended denial, stating "I still do not see how she is worse than when she was able to work."  *Id.*  Plaintiff was informed by a letter dated July 13, 1999 that an appellate reviewer had considered her claim on July 1, 1999 and denied STD benefits through July 2, 1999.  *Id.* at 520.  It is not clear from the record whether Plaintiff's benefits application actually sought benefits beyond that point.

**Second STD Application**
**Applied**:     September 23, 1999
**Denied**:      October 11, 1999
**Appealed**:  November 9, 1999
**Denied**:      December 23, 1999

Plaintiff's second STD application apparently dealt with both her neck and back pain, as well as her ovarian surgery.  Plaintiff had surgery on September 20, 1999, only

informing her employer on September 23, 1999, as she was on unpaid personal leave

at the time.  Her leave was set to expire on September 29, 1999; she was told she

would be coded out as ill starting the following day, and that she could become eligible

for STD benefits following the seven day waiting period required under the plan (on

October 6, 1999).  *Id.* at 504.  While Dr. Harrison had recommended a return to work

date of October 1, 1999 (five days prior to end of her seven day waiting period), Plaintiff

did not return to work.  Instead she visited Dr. Harrison's office, where her nurse noted

that plaintiff's wound was oozing dark blood and that her abdomen was "quite well-

bruised," and required the application of "moist heat" to the area, but that she was

otherwise "quite lively and feels well." *Id.* at 473.  Those comments were forwarded to

Plaintiff's employer.  On October 7, her doctor revised his recommendation, writing her

a note stating that she would be unable to work until October 11, 1999 due to

complications from surgery, *id.* at 449, but her STD benefits had already been denied

when the note was written, *id.* at 454.

       After her denial, she continued to see a specialist, Dr. Harvie, for her back pain.

On November 19, 1999 he recommended she undergo neck surgery on December 14,

2009.  *Id.* at 865.  However, when she went in for her pre-op visit, he canceled the

surgery due to the apparent success of the nerve blocks.  Nonetheless, he

recommended that she remain off work until further notice.  *Id.* at 858.

       Plaintiff subsequently requested a disability pension.  As a part of that process,

Qwest directed an independent medical evaluation and an independent psychiatric

evaluation.  *Id.* at 733.  Plaintiff's own doctor also sent her for an independent

evaluation by a spine specialist.  *Id.* at 670-73.  The reports provided by these doctors

were not supportive of Plaintiff's cause, though the spine specialist's report did

acknowledge that Plaintiff's symptoms were at least partially bona fide.

     Dr. Gelinas, the spine specialist recruited by her own doctor reviewed her history

and wrote:

> She has chronic cervical and lumbar pain, right groin pain of unknown
> etiology, but no evidence of significant spinal nerve root compression. . . . I
> am of the opinion that any surgical intervention in this patient would not
> provide her with any significant relief of her symptoms. . . . I really think this
> is a pain management issue with her, and it should be treated as such. . . .
> In addition, my general feeling with her is that this patient had such severe
> cervical and lumbar generative changes that she is essentially unemployable.
> . . . I think [her condition is] more related to degenerative aging than to any
> specific work related injury.

*Id.* at 673.  Based in part on the spine specialist's recommendation, Plaintiff was

awarded Social Security disability benefits.  *Id.* at 698-701.

     The doctor retained by Qwest, Dr. William Wellborn, offered a more pessimistic

view, stating that she had *mild to moderate* degenerative changes to the cervical spine,

and degenerative changes to the lumbar spine.  *Id.* at 651.  He also noted her

longstanding scoliosis.  *Id.*  He concluded, however, that these factors "would not

explain the level of pain and disability that is reported by Ms. Suazo-Abeyta" and that he

found "no medical basis to prevent Ms. Suazo-Abeyta from working as a sales

consultant for her previous employer.  She could probably work at least at a sedentary level."  *Id.* at 652.

Her psychiatric evaluator, Dr. Theodore Scharf, was similarly skeptical, noting "[i]t would appear that the most likely finding in this case would be a description of symptom magnification which has convinced Ms. Suazo-Abeyta that she is unable to perform her usual duties of her employment."  *Id.* at 624.  The psychiatrist concluded that there was no reason she could not return to work.

Finally, Plaintiff underwent a "function capacity evaluation report" by an occupational therapy provider, Novacare Outpatient Rehabilitation.  Novacare's report states that:

> Ms. Suazo-Abeyta demonstrated inconsistencies in pain reports and pain behaviors.  She reported pain into the left scapular area with squatting, which did not involve any use of the shoulder or scapula.  She walked with a limp during uninstructed gait and carrying.  Her limp during those activities was indicative of a left leg problem, not a right leg problem as reported."

*Id.* at 635.  The report concluded that Plaintiff "is capable of SEDENTARY work based on the capabilities demonstrated during the FCA."  *Id.* (emphasis in original).

On June 15, 2000, Defendant's predecessor, U.S. West, notified Plaintiff in writing that as of July 28, 2000 she would have been on unpaid leave for twelve months.  *Id.* at 743.  She was further notified that she would be separated from the payroll if she did not return to work by July 31, 2000.  *Id.*  Plaintiff did not return to work by July 31,

2000, and was accordingly removed from U.S. West's payroll.  *Id.* at 735.

Plaintiff was absent from her job from April 8, 1999 until she was terminated on July 31, 2000.  Her two requests for STD benefits occurred in the midst of that period, the first one encompassing her April 8, 1999 departure from work.  The Plan sets forth an STD benefits payment schedule applicable to "On-Job/Occupational Illness/Injury" and an additional STD benefits payment scheudle for illnesses or injuries that are not "on-job" or "occupational."  Plan at 12.  For an individual with 24 years of service such as Ms. Suazo-Abeyta, the Plan allows for payments as follows:

> **On-Job Disability Payment Schedule Benefits**
> - 100% of Normal Take Home Pay for 39 weeks and 60% of Normal Take Home Pay for 13 weeks
>
> **Illness/Off-Job Disability Payment Schedule Benefits**
> - 100% of Base Pay for 39 weeks and 60% of Base Pay for 13 weeks

*Id.*[2]  Consequently, if the PA's denial of benefits was in error, and Ms. Suazo-Abeyta was entitled to STD benefits, she would have been entitled to up to one full year of benefits beginning on April 8, 1999.  Additionally, if the Court determines that Plaintiff's second request for STD benefits and her associated absence from work can be considered an "unrelated absence" due to injuries or illness separate and apart from those which precipitated her first request for STD benefits, and if it determines that the

---

[2]  The plan further allows for the amount of STD benefits to be paid by the employer to be offset by the amount of non-taxable Workers' Compensation received by the employee.  *Id.* at 13.  There is no indication in the record that Plaintiff received Workers' Compensation for any of her time away from work.

PA's denial of the second request was arbitrary and capricious, additional benefits may be in order.

Whether Ms. Suazo-Abeyta would be eligible for benefits under the "On-Job" or "Off-Job" benefits schedule is not clear based on Ms. Suazo-Abeyta's alleged injuries. The record portrays a history of pre-existing conditions and injuries resulting from incidents outside the workplace, however, it also details complaints regarding the setup of her workspace, which she claims aggravated her supposed injuries.

### III.  Legal Issues

### A.  Extent of Review on Remand

On remand, the PA considered additional information developed during its assessment of Plaintiff's request for disability pension, information that was unavailable to it when it first denied STD benefits.  Plaintiff asserts that on remand Defendant was obligated to review only the record as it existed at the time of denial, and that its review of additional evidence on remand rendered Qwest's decision arbitrary and capricious. Plaintiff asserts that on the contrary, it has a fiduciary duty to review any information it is aware of which may be relevant to a denial or grant of disability benefits.

### B.  Were Short Term Disability Benefits Properly Denied?

Regardless of the Court's determination as to the consideration of additional evidence on remand, it must still determine substantial evidence existed upon which to properly deny STD benefits.  Defendant asserts that its denial on remand was proper

even relying only on the un-enhanced record, while Plaintiff counters that the Defendant's alternative argument is an attempt to rely on *post hoc* rationales, and that because it looked at the enhanced record on remand, the denial is arbitrary and capricious and must be reversed.

### C.  Did the PA Properly Consider Plaintiff's Ovarian Removal Surgery?

The Court specifically directed the PA to consider on remand whether Plaintiff's ovarian surgery rendered her eligible for STD benefits.  The PA's decision on remand did not explain whether or not it did so, though documents pertaining to the surgery are listed in the table of medical records reviewed during the remand.  Plaintiff asserts that this is insufficient, and that the PA's lack of discussion of the ovarian surgery is arbitrary and capricious.

### D.  Prejudgment Interest

Plaintiff points out that in the event this Court awards her summary judgment, she will be entitled to STD benefits for periods of missed work nearly ten years ago in 1999, and that this case has been in litigation for some seven years.  Consequently, a money award at this juncture would amount to allowing Qwest to pay a 1999 debt in 2009 dollars at Plaintiff's detriment unless she is awarded prejudgment interest.

### E.  Attorney's Fees and Costs

Plaintiff additionally seeks attorney's fees and costs, alleging not only that she should ultimately prevail on her claims; but that Qwest has exhibited a degree of bad

faith in denying her disability benefits; is in a position to satisfy such an award, and

finally that such an award would deter other actors in similar circumstances.  *See*

*Gordon v. U.S. Steel*, 724 F.2d 106, 109 (10th Cir. 1983) (setting forth factors which

should assessed by courts in awarding attorneys fees in disability cases).

### IV.  Standard of Review

While the parties have styled their motions as cross motions for summary

judgment, this is in actuality an appeal of a PA's decision pursuant to 29 U.S.C. § 1132.

As was the case in this Court's last review of this matter, it must examine the PA's

decision for abuse of discretion.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,

109 (1989) (distinguishing between disability plans where administrators have

discretionary authority to interpret the plan and determine applicants' eligibility for

benefits and all other types of plans).  The Tenth Circuit has held that review for abuse

of discretion in the ERISA context is synonymous with review to determine if a decision

was arbitrary and capricious.  *Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 825

n.1 (10th Cir. 1996).

A lack of substantial evidence, mistake of law, bad faith, or conflict of interest are

all indicia of arbitrary and capricious action.  *Caldwell v. Life Ins. Co. Of N. America*, 287

F.3d 1276, 1282 (10th Cir. 2002).  "'Substantial evidence is such evidence that a

reasonable mind might accept as adequate to support the conclusion reached' . . . [and]

requires more than a scintilla and less than a preponderance.'"  *Sandoval*, 967 F.2d at

382 (quoting *Flint v. Sullivan*, 951 F.2d 264, 266 (10th Cir. 1991)).  It is certainly of no

consequence that evidence regarding eligibility for benefits conflicts.  *Kimber v. Thiokol

Corp.*, 196 F.3d 1092, 1099 (10th Cir. 1999) (affirming a denial of benefits based on

conflicting evidence where "a rational plan administrator" could have discounted the

evidence in favor of benefits and placed greater weight on contrary evidence).

### V.  Analysis

### A.  Extent of Review on Remand

The critical issue in this case revolves around the extent of review the PA

engaged in on remand, which in this case encompassed evidence not in the record at

the time of the initial denials of STD benefits.  Not surprisingly, the case law on this

question is not on all fours with the facts of this case.  In fact, most if not all of the

existing case law on the issue deals with the extent of a *court's review* of the PA's

decision, not of the PA's second look at its own decision.  Furthermore, much of the

existent case law examines courts' *de novo* review of PA's decisions under non-

discretionary plans.  In those cases, it was necessary to determine whether *de novo*

review required courts to examine expanded records including information not viewed

by the PA.  It would seem the instant case, involving a second look by a court after a

remand to the PA is unique.

The majority of decisions on this matter state the same general proposition: a

reviewing court should only review the record as it existed when the PA made his

decision.  *See Sandoval,* 967 F.2d at 381 ("The district court's subsequent finding based

upon later-developed evidence . . . was irrelevant to this inquiry and therefore exceeded

the scope of the court's review.").  The *Sandoval* Court addressed allegations by a plan

participant that a PA had should have considered evidence of psychological impairment,

though the participant had never provided such evidence to the PA.  *Id.* at 379.  The

Tenth Circuit affirmed the findings of the PA and the lower court that disability benefits

were not warranted, stating that "[a] federal court is to focus on the evidence before the

trustees at the time of their final decision and is not to hold a *de novo* factual hearing on

the question of the applicant's eligibility."  *Id.* at 381.  Of the plan participant's attempts

to force the PA to consider evidence not submitted at the time of the initial benefits

decision, the Tenth Circuit emphatically stated:

> Sandoval is not entitled to a second chance to prove his disability . . . .  In
> effect a curtain falls when the fiduciary completes his review, and for the
> purposes of determining if substantial evidence supported the decision, the
> district court must evaluate the record as it was at the time of the decision.

*Id.*  Rather than consider additional evidence in its review of the PA's decision, the

district court was to limit its review to the evidence available to the PA.  *Sandoval*'s

outcome makes intuitive sense: If a district court considered additional evidence

presented to it, PA decisions not to award benefits would possess no finality but would

instead be perpetually eligible for judicial review and revision no matter what the basis

of the PA decision.

Other circuits have held similarly even in the context of a *de novo* review.  *See, e.g., Perry v. Simplicity Engineering*, 900 F.2d 963, 966 (6th Cir. 1990) (even where a court is conducting a *de novo* review, as allowed in circumstances not relevant here, the *de novo* review is of the record before the trustees, not of additional information); *but c.f. Vanderklok v. Provident Life & Accident Ins. Co.,* 956 F.2d 610, 617 (6th Cir. 1992) (allowing the admission of additional evidence in a *de novo* review because the PA failed to follow proper procedures in terminating benefits).

The Tenth Circuit seems to have adopted a middle ground approach: "We emphasize that it is the unusual case in which the district court should allow supplementation of the record."  *Hall v. UNUM Life Ins. Co.*, 300 F.3d 1197, 1203 (10th Cir. 2002).  The *Hall* Court addressed a district court's *de novo* review of a PA's denial of benefits, implying that while it may be rare, there are occasions when a court should consider additional information from outside the record.  For instance, consideration of additional evidence might be appropriate where district courts receive cases with limited existent records, or where particularly complex issues present themselves and require further elucidation.  *See id.*  The *Hall* court went on to state that where a party seeks to admit additional information, it bears the burden of establishing why the existent record is insufficient, and why the additional information is necessary.  *Id.*  Defendant draws the Court's attention to another Tenth Circuit case for the proposition that the PA actually had a *duty* to review the additional information contained in the entire record,

-17-

not just the record as it existed at the time of the STD denials.  *See Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792 (10th Cir. 2004) (employing an "arbitrary and capricious" standard of review).[3]  Although Aetna claimed there was insufficient evidence in the record to grant disability benefits initially, the Tenth Circuit stated that:

> fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory.

*Id.* at 807.  The *Gaither* Court asserted that if a plan administrator believes more information is needed to make a reasoned decision, it should ask for it.  *Id.* at 774. Although a plan administrator need not "pore over the record for possible bases for disability that the claimant has not explicitly argued, or consider whether further inquiry might unearth additional evidence when the evidence in the record is sufficient to resolve the claim one way or the other," *id.* at 773, a plan administrator faced with "a claim that a little more evidence may prove valid should seek to get to the truth of the matter . . . . " *Id.* at 774.  It is worth noting, however, that *Gaither* did not involve a PA's duty on remand, but instead discussed its duty when reviewing a claim initially.

---

[3]  Gaither was a victim of multiple myeloma, an extremely painful form of cancer.  During his treatment for the disease, he was prescribed numerous powerful narcotic painkillers.  After his disease went into remission, he attempted to return to work, but was precluded from doing so because his employer would not allow him to work while taking narcotics.  He eventually applied for disability payments, but was denied because his medical records showed his illness had stabilized and did not prevent him from working.  He appealed Aetna's decision, eventually reaching the Tenth Circuit, where he argued that while his cancer may have been in remission, he was by then addicted to painkillers.  Aetna countered that the record did not show evidence of addiction.

Defendant in this case argues that the same principle applies: It should not be expected limit itself to a constricted record when additional relevant information is readily available.

When this Court remanded the case to Qwest's Disability Plan PA, it did so so that the PA could "reconsider the record and determine if Plaintiff was disabled under the [correct] definition of 'disability' provided in the Disability Plan."  FFCL at 31.  Indeed, the Court notified the parties that it would "offer no opinion as to whether the documentation submitted by the Plaintiff in support of her [STD] benefits represents sufficient evidence of disability under the appropriate standard."  FFCL at 29.  It did not remand to provide the Qwest PA with an opportunity to bolster its case by performing independent medical evaluations it had failed to perform initially.  *See Sandoval*, 967 F.2d at 381 ("Sandoval is not entitled to a second chance to prove his disability."). Qwest is no more entitled to a second chance to prove Ms. Suazo-Abeyta is not disabled than Mr. Sandoval was to prove his disability in that case.

Even if post-denial evidence was admissible under some limited circumstances in an "arbitrary and capricious" review, as is suggested by *Gaither*, Qwest has not carried its burden of demonstrating why such evidence should be considered here.  *See Hall*, 300 F.3d at 1203.  Qwest had ample opportunity over the course of Ms. Suazo-Abeyta's two requests for STD benefits, each of which was appealed, to ensure its basis for denying benefits was appropriate by performing a thorough investigation of her claims.

All of the post-denial evidence Qwest seeks to admit at this juncture could easily have been obtained prior to the PA's initial denial of benefits, including the opinions of Qwest's retained physician, Dr. Wellborn, and its clinical psychiatrist, Dr. Scharf, which Qwest asserts require summary judgment in its favor.  Consequently, this Court will not consider any post-December 1999 evidence in determining whether the PA's decision on remand was arbitrary and capricious, but will instead review whether the PA's denial of STD benefits on remand can be said to be based on substantial evidence available when the initial benefits determinations were made.

**B.  Were STD Benefits Otherwise Properly Denied?**

Without the extra-record evidence considered by Qwest's PA on remand, the question of whether Ms. Suazo-Abeyta's disability benefits were properly denied is, at first glance, a closer question.  Defendant nonetheless asserts that even on the basis of the information it had from Plaintiff's treating physicians, her acupuncturist, and the assessment of the her medical records made by Defendant's doctor, denial was still appropriate.  Plaintiff objects to this contention, however, asserting that Qwest's reasoning constitutes an improper *post hoc* rationale.

### 1.  *Post Hoc* Rationales May Not Be Used

The Tenth Circuit has indeed followed a number of other circuits in warning against the employment of *post hoc* rationales to justify or bolster a denial of benefits on remand.  *See Flinders v. Workforce Stab. Plan of Philips Petrol. Co.*, 491 F.3d 1180,

1190 (10th Cir. 2007) ("In reviewing a plan administrator's decision, we may only

consider the evidence and arguments that appear in the administrative record."); *see*

*also Schadler,* 147 F.3d 388, 397-98 (5th Cir. 1998).  "This means that, when reviewing

a plan administrator's decision to deny benefits, we consider only the rationale asserted

by the plan administrator in the administrative record and determine whether the

decision, based on the asserted rationale, was arbitrary and capricious."  *Flinders*, 491

F.3d at 1190.  "To determine whether a plan administrator considered and asserted a

particular rationale, we look only to those rationales that were specifically articulated in

the administrative record as the basis for denying a claim."  *Id.*  The reason for

prohibiting *post hoc* rationales is to prevent ERISA claimants from being "'sandbagged

by after-the-fact plan interpretations devised for purposes of litigation.'"  *Id.* at 1191

(quoting *Marolt v. Alliant Techsystems, Inc.*, 146 F.3d 617, 620 (8th Cir. 1998)).

     In this case, Defendant's justification or rationale for denying STD benefits on

remand is quite simple.  The denial cites to the critical pieces of evidence considered,

ultimately concluding that:  "According to the objective medical information provided,

from 1999 through 2000, the claimant was capable of performing sedentary to light work

capacity on a full time basis according to the records reviewed."  Defendant additionally

asserts that "[e]ven if this Court now decides that the Plan Administrator should

consider only the opinions of Drs. Tadian, Xu, and Hazelton at the time of the first denial

and apply the legal standard previously specified by the Court, Qwest's denial of

benefits still would not be 'arbitrary and capricious.'"

This case is not at all similar to cases such as *Flinders*, which involved a discussion of *"post hoc* rationales" revolving around a differing interpretation of the plan language used to justify a result.  Indeed, Defendant's assertion that substantial evidence exists to support its decision even without the post-2000 are not so much *post hoc* rationales, as an assertion regarding the point on the continuum that the "substantial evidence" requirement is met.  The rationale employed under either of Defendant's theories is simply that the objective medical evidence available to it does not establish that the Plaintiff was disabled within the meaning of the plan.[4]

Furthermore, Plaintiff is in no way disadvantaged, or "sandbagged," by this argument; Plaintiff's initial claims for STD benefits were denied on essentially the same theory as Defendant now argues as an alternative basis for denial on remand.  Plaintiff has also had ample opportunity to respond to Defendant's arguments at this stage of the case.  Indeed, insofar as Plaintiff herself argues that Defendant should only have considered the pre-December 1999 evidence, she surely anticipated that if Defendant again denied benefits on remand, the reason would be for lack of sufficient medical evidence to support benefits in that portion of the record.

For all of these reasons, the Court finds that it would be acceptable to determine

---

[4]   The only exception to this is the Defendant's reliance on a psychiatrist's assessment that Plaintiff's professed pain and disabilities are a result of "symptom magnification."  No where in the pre-December 1999 record can such a justification for Plaintiff's symptoms be found.

that the PA's decision was not arbitrary and capricious based only on part of the record

when the portions of the record disregarded by the Court all support Defendant's

position.  Even under such an analysis, however, the Court must still assess whether

the pre-December 1999 record contains "substantial evidence" on which to base a

denial of benefits.

### 2.  Does the Pre-December 1999 Record Contain "Substantial Evidence" Supporting the Denial of Benefits?

As previously discussed, the pre-December 1999 evidence consists of the

reports of one examining doctor, Dr. Tadian; Plaintiff's acupuncturist, Dr. Xu; and the

PA's retained reviewer, Dr. Hazelton, who never actually examined Plaintiff; and various

documents from Plaintiff's personnel and health services files.   Their reviews were

mixed, with only Dr. Tadian strongly recommending a disability finding, Dr. Xu

recommending Plaintiff take a week of from work and continue with her treatments, and

Dr. Hazelton recommending the Plaintiff not receive benefits.  Dr. Hazelton's review

concluded "I still do not see how she is worse than when she was able to work."

Plaintiff cites a modicum of case law for the proposition that lending too much

credence to "independent" reviewers is arbitrary and capricious.  *See, e.g., Clausen v.*

*Standard Ins. Co.*, 961 F. Supp. 1446, 1455-56 (D. Colo. 1997).  However, the Supreme

Court has stated that ERISA does not require any special deference to the opinions of

treating physicians over any other professional.  *Black and Decker Disability Plan v.*

*Nord*, 538 U.S. 822, 828 (2003).  The "other professional" in *Black and Decker*, however, was an independent neurologist retained by the PA who *actually examined* the claimant, whereas Dr. Hazelton had no personal contact with Ms. Suazo-Abeyta. Consequently, Dr. Hazelton's opinions do not constitute objective medical evidence as required by Qwest's disability plan, but are instead simply conclusions based on objective medical evidence developed by others.  At the very least Dr. Hazelton's opinions must be significantly discounted, if not totally disregarded.[5]

Without significant weight placed on Dr. Hazelton's conclusions, the record is essentially dominated by the records of Drs. Xu and Tadian and their resulting conclusions, all of which are based on the doctors' personal physical evaluations and treatment of Ms. Suazo-Abeyta.  Both Xu and Tadian believed Plaintiff's ailments and symptoms were bona fide, though they disagreed somewhat regarding their severity. Each rendered opinions that Ms. Suazo-Abeyta was unable to perform the requirements of her job during the relevant period in 1999.   Particularly noteworthy are the Dr. Tadian's references to x-rays "confirming degenerative disc disease and neural foramina encroachment." A.R. at 1031.  The pre-December 1999 record contains no evidence refuting this assessment (even the post-December 1999 reviews concur that

_____

[5]  That said, Dr. Hazelton's Affidavit, attached as Exhibit A to Defendant's Memorandum in Support of its Motion for Summary Judgment, makes clear that in the process of formulating her opinion, she considered the objective medical evidence that was contained in the record.  In reviewing the parties' motions for summary judgment, the Court has also considered the evidence reviewed by Dr. Hazelton, it simply does not place great weight on her conclusions.

Plaintiff was indeed suffering from degenerative disc disease).

Although Dr. Hazelton complained that Plaintiff had not explained what caused her injuries to become debilitating when she had been working despite them for years, AR at 531, Plaintiff, her doctor, and her acupuncturist make repeated references to her work position aggravating her lower back and creating new neck and shoulder pain. Defendant did not perform an ergonomic evaluation to determine whether her workspace could be modified to enable her to perform her duties. Although an alternate workspace was suggested, Plaintiff refused it and provided reasons why she did so; Qwest made no subsequent offers to modify her workspace or her duties. Without any indication in the record to suggest that such modifications were possible, a conclusion that she could perform the duties of her job or another job in a either a modified or unmodified capacity appears unsupported.

Even under the extraordinarily deferential "substantial evidence" standard of review required here, the Court is struck by the complete lack of objective medical evidence undergirding the PA's decision in this case. No doctor that actually examined Ms. Suazo-Abeyta prior to the PA's decisions to deny her disability benefits found that she was fit to perform the duties of her job, and the only medical doctor that examined her up to that point rendered an opinion finding her disabled. Consequently, the Court finds as a matter of law that the Defendant's decision to deny STD benefits on remand was arbitrary and capricious; STD benefits should have been awarded pursuant to

Plaintiff's first request on April 19, 2009.[6]

### 3. Did the Plan Administrator Err by Failing to Consider Plaintiff's Ovarian Removal Surgery on Remand?

Finally, Plaintiff asserts that the PA's denial of benefits on remand was arbitrary and capricious in not reviewing whether her ovarian removal surgery should have justified STD benefits.  This would be true if indeed the PA did not review her surgery.  However, the PA's summary of its actions on remand, which was provided to the Plaintiff at the time of denial and even included as an exhibit to Plaintiff's summary judgment memo, lists documents pertaining to the surgery as having been reviewed.  (Memo. In Support of Pl.'s Renewed Mot. for Summary Judgment, Ex. 1. at 3.)   While the PA apparently considered Ms. Suazao-Abeyta's ovarian removal surgery and determined that she was not eligible for STD benefits during her recovery, the Court is left to wonder what the basis of the denial was.

Contained in those documents pertaining to Ms. Suazao-Abeyta's surgery which

---

[6]  Defendant also makes much of the fact that many of the symptoms experienced by Ms. Suazo-Abeyta predated her application for benefits, and could be considered chronic in nature.  For example, in its reply memorandum in support of its Cross-Motion for Summary Judgment, Defendant even labels this fact the "underlying problem" which necessitates dismissal.  (Def.'s Reply Memo at 7.)  However, the possibility that Plaintiff's maladies date back a significant period of time, or were not work-related, is irrelevant to this case.  The Plan clearly contemplates STD benefits for injuries and illnesses whose origins are not related to the workplace but nonetheless render the claimant "disabled" under the Plan.  *See* Plan at 12.  Furthermore, a chronic condition, which a claimant coped with for a period of time, but which worsened in some way such that she was no longer able to perform her work could well cause her to qualify as "disabled" under the Plan.

were reviewed by the PA were statements by the Plaintiff's nurses who stated that she was "quite lively" and "feels well."  Additionally, the PA considered a note from her surgeon recommending she remain away from work until October 11, 1999 (although the note was not received by the PA prior to the initial denial of STD benefits, it was available during the appeal and on remand).  Plaintiff was eligible to begin receiving STD benefits when her required seven day waiting period expired on October 6, 1999.

Without a competing assessment recommending that she return to work before October 11, 1999, the Court can see no substantial evidence on which to base a denial of short term benefits.  The PA's decision to deny STD benefits for the five day period between October 6, 1999 and October 11, 1999 was arbitrary and capricious, as was the PA's denial of benefits on appeal.  Given Dr. Harrison's explicit and uncontroverted note that Plaintiff should not return to work until October 11, 1999, it is clear that benefits should have been awarded for that five day period.

It is apparent that the major reason for Ms. Suazo-Abeyta's second STD benefits request was the ovarian removal surgery rather than those injuries which precipitated her first request.[7]  As a result, she is eligible for benefits separate and apart from the 52

_____

[7] The findings of the doctor that recommended neck surgery, Dr. Harvie, were also considered at this stage.  Although Dr. Harvie initially considered Plaintiff for neck surgery, he determined that it was not necessary, and opted instead to pursue the same treatment regime that Plaintiff was already undergoing, which included nerve blocks and acupuncture.  However, the Defendant's equating of the cancellation of Plaintiff's surgery with evidence of her ability to work, is something of a logical fallacy.  At no point did Dr. Harvie recommend that Plaintiff return to work.  Indeed, he indicated that she should continue to remain off work.  Consequently,

weeks of benefits she was eligible to receive as a result of the first request.  *See* Plan at 17.

**C.  Plaintiff's Demand for Prejudgment Interest**

Prejudgment interest is generally available "to compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of the judgment." *Anixter v. Home-Stake Prod. Co.*, 977 F.2d 1549, 1554 (10th Cir. 1992) (quotations and citations omitted); *see also Caldwell v. Life Insurance Co. Of N. America*, 287 F.3d 1276, 1287 (10th Cir. 2002) (citing *Anixter* and upholding an award of prejudgment interest in an ERISA case but adjusting the date when such interest began to accrue).  In the Tenth Circuit, a two step analysis must be performed to determine whether an award of prejudgment interest is warranted.  *See Caldwell*, 977 F.3d at 1286 (quoting *Eastman Kodak Co. v. Westway Motor Freight, Inc.*, 949 F.2d 317, 321 (10th Cir. 1991)).  "The district court must first determine whether the award of prejudgment interest will serve to compensate the injured party.  Second, even if the award of prejudgment interest is compensatory, the district court must still determine whether the equities would preclude the award of prejudgment interest." *Id.* (quotations and citations omitted).  If an award of prejudgment interest is proper, interest begins to accrue in an ERISA case on the date when the beneficiary first files a claim.  *Id.* at 1287.

---

(continued) even if the lingering complications of Plaintiff's neck surgery were insufficient to justify disability, Dr. Harvie's recommendations would still require such a result.

Prejudgment interest is clearly compensatory in this case.  Plaintiff first sought STD benefits in 1999, nearly ten years ago.  Her benefits were denied initially because Defendant reviewed her request under an incorrect definition of "disability" and later because Defendant arbitrarily and capriciously analyzed the objective medical evidence before it.  Had it not done so, STD benefits would have been awarded quite some time ago.  An award of prejudgment interest based on her initial April 19, 1999 STD benefits application would serve to compensate Ms. Suazo-Abeyta for the monetary detriment she experienced in the intervening years.  *See Caldwell*, 287 F.3d at 1287 ("The policy that underlies awarding prejdugment interest seeks to make persons whole for the loss suffered because they were denied use of money to which they were legally entitled.")

Having determined that prejudgment interest would be compensatory in nature, the Court must assess whether equity somehow favors Qwest such that interest should not be awarded.  Qwest has not put forth, nor can the Court imagine, a legitimate reason why prejudgment interest should not be awarded.  Plaintiff did not contribute to Defendant's use of the incorrect definition of "disability" nor did she somehow prevent Defendant from properly analyzing the medical evidence before it.  Had Qwest properly assessed her claims initially, Ms. Suazo-Abyeta would not have been deprived of the her deserved benefits. Finally, as Plaintiff aptly put it, if prejudgment interest is not awarded, Defendant will essentially be allowed to pay a 1999 debt in 2009 dollars, which cannot be said to be equitable.

Yet to be determined, however, is the interest rate to be applied in this case. Congress has provided a simple manner of determining the interest rate to be applied to judgments which are not promptly paid.  *See* 28 U.S.C. § 1961(a).[8]  While 28 U.S.C. § 1961 might well provide a rational and fair means of determining the interest rate to be applied here, the Tenth Circuit has held that district courts are not bound to utilize the statute's formula.  *See Weber v. GE Group Life Assur. Co.*, 541 F.3d 1002, 1016-17 (10th Cir. 2008) (finding that a district court did not abuse its discretion in applying a prejudgment interest rate of 15% required under Oklahoma law); *Allison v. Bank One-Denver*, 289 F.2d 1223, 1244 (2002) (upholding a district court's application of an 8% prejudgment interest rate required under Colorado state law in the context of an ERISA case); *Caldwell*, 287 F.3d at 1287 (collecting out-of-circuit cases for the proposition that calculating a just interest rate lies in the sound discretion of the district court, and upholding the district court's application of a modified version of 28 U.S.C. § 1961(a)'s formula).

Considering both the wide range of methods the Court could, in its discretion, utilize to determine an appropriate interest rate here, as well as the fact that the parties have not rendered an opinion on the matter, the Court finds it appropriate to order

---

[8] 28 U.S.C. § 1961(a) applies specifically to post-judgment interest, and provides that: "Such interest shall be calculated . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. [sic] the date of the judgment."

additional briefing on this limited subject as discussed in Section VI below.

**D.  Plaintiff's Demand for Attorney's Fees and Costs**

      In any action brought by an ERISA plan participant, the court "in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).  The Tenth Circuit has generally required a party to prevail before it may be awarded attorney's fees and costs.  *See e.g., Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 828 (10th Cir. 1996) (refusing to award fees and costs where the plaintiff did not prevail on his ERISA claims); *Arfsten v. Frontier Airlines*, 967 F.2d 438, 442 n.3 (10th Cir. 1992) (labeling plaintiff's request for fees and costs moot where he did not prevail in his underlying claims).

      While prevailing on the underlying ERISA claims is a necessary prerequisite to an award of fees and costs, it is not in of itself sufficient to require an award.  *See* 29 U.S.C. § 1132(g)(1) (placing the award of fees and costs in the discretion of the court); *see also Gordon,* 724 at 108 ("[T]he granting of attorney's fees is not to be done as a 'matter of course,' but is discretionary in nature.")  Courts in the Tenth Circuit are required to apply a five prong test to assist them in determining whether a discretionary award of fees and costs is justified.  *See Gordon*, 724 F.2d at 109.  The five prong test requires courts to consider, at a minimum:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability
> of the opposing parties to personally satisfy an award of attorney's fees; (3)
> whether an award of attorney's fees against the opposing parties would deter

others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

*Id.*  Plaintiff asserts that four of the five prongs are met in her case; she admits that her request for fees is self-interested and does not seek to "benefit all participants and benefiiciaries" of the Plan or resolve a significant legal question regarding ERISA. However, the Court does not find the remainder of the test met in such a manner as to justify an award of attorney's fees and costs.

First and most importantly, the Court can discern no bad faith on the part of the PA in initially denying benefits, nor in its denials on appeal and later on remand.  Rather, it would appear that the PA first mistakenly applied an incorrect definition of "disabled," which required remanding the case for further consideration.  Defendant's consideration of additional evidence on remand cannot be considered to have been done in bad faith, either.  As previously discussed, this case presents novel legal issues, and the Court cannot fault the PA for attempting to consider evidence which was by then in its possession, and which appeared to justify a denial of benefits.

Second, because it is not apparent that Defendant acted with bad faith, deterrence is not necessary.  Indeed, the Court can discern no reason why an award of attorney's fees would discourage other plan administrators from acting as Defendant did here.  Defendant initially misinterpreted its own plan, and subsequently incorrectly but

understandably attempted to take into account late-developed evidence supporting its position regarding the denial of benefits.  Defendant's actions, while arbitrary and capricious, need not be punished for the sake of preventing others from acting in the same manner.

Finally, Qwest concedes that it is financially stable and that its benefits plan is well-positioned to remunerate Plaintiff's counsel.  However, merely being capable of paying attorney's fees and costs does not actually militate in favor of granting such an award.  The Court does not find the size of Qwest's coffers to be a convincing reason to force it to compensate Plaintiff for her legal costs.

## VI. Conclusion

Plaintiff's Motion for Summary Judgment is GRANTED in part and DENIED in part; Defendant's Cross Motion for Summary Judgment is DENIED.

The Court finds as a matter of law that rather than applying the appropriate definition of "disability" to Plaintiff's existing STD benefits claims as instructed by the Court in its order remanding the case, Defendant improperly considered evidence on remand that was not available to it when it first denied her claims.  Without the benefit of the improperly considered evidence, Defendant's decisions on remand cannot be said to be based on substantial evidence and must instead be labeled "arbitrary and capricious." The relevant objective medical evidence makes clear that STD benefits should have been awarded as a result of both of Plaintiff's applications.  The lengthy delay further

makes an award of prejudgment interest necessary in order to fully and equitably compensate Plaintiff.  However, an award of attorney's fees and costs is not warranted and shall not be granted.

No later than May 1, 2009, the parties shall submit additional briefing to the Court regarding (1) recommended means for calculating a reasonable prejudgment interest rate; (2) whether Plaintiff's benefits should be calculated under the On-Job or Off-Job benefits schedule; and (3) the number of days for which STD benefits should be awarded and the total amount of benefits owed Plaintiff with interest calculated separately.  The parties may have until May 13, 2009 to respond to the arguments raised by one another's briefing, and until May 20, 2009 to submit reply briefs.

It is so ORDERED.

DATED this 31st day of March, 2009.

_William F. Downes_

United States District Judge